IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BROOKS JAY TRANSPORTATION, INC.,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION AND ORDER |
| v. | | 17-cv-084-wmc |
| FEDEX GROUND PACKAGE SYSTEM, INC., | | |
| | Defendant. | |

Plaintiff Brooks Jay Transportation, Inc., alleges that defendant FedEx Ground Package System, Inc., transferred a client account within Brooks Jay's service area to another FedEx Ground transportation provider in breach of the parties' operating agreement. Before the court is defendant's motion for summary judgment. (Dkt. #36.) For the reasons that follow, the court will deny that motion, finding genuine issues of material fact as to whether: (1) the operating agreement was limited to Brooks Jay's Madison, Wisconsin, station; (2) FedEx Ground breached the agreement by transferring the servicing of a customer account to a different station; and (3) Brooks Jay suffered damages as a result of any breach.

## INITIAL MATTERS

Before turning to the parties' proposed findings, the court must take up a number of preliminary objections. *First*, in proposing findings of facts and in response to defendant's proposed findings, plaintiff principally relies on an affidavit by its President and sole owner Bernard ("BJ") McMahon. With respect to a number of proposed findings and responses, defendant invokes the "sham declaration rule," which provides that "parties

cannot thwart the purposes of Rule 56 by creating 'sham' issues of fact with affidavits that contradict their prior depositions." *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168 (7th Cir. 1996). The Seventh Circuit has cautioned restraint in applying this rule, however, particularly when the witness testifies at an earlier deposition that he or she cannot remember a particular fact. *See id.* at 1169; *EEOC v. Aurora Health Care, Inc.*, 12-cv-984-JPS, 2015 WL 2344727, at *5 n.28 (E.D. Wis. May 14, 2015) ("[The witness's] general lack of memory at a specific time is not specifically contradicted by her later memory. Indeed, that is often the nature of memory."). Having reviewed McMahon's deposition testimony, the court does not find contradictions that would warrant the court disregarding portions of his declaration. While defendant is free to cross-examine McMahon on the stand at trial regarding his inability to recall the specifics of certain discussions or provide a more complete description of the nature of plaintiff's claim, the court will not strike or otherwise disregard the challenged portions of McMahon's declaration.

*Second*, defendant challenges other portions of McMahon's declaration, and a declaration by another contractor, Mark Verstraete, as impermissible parol evidence. As an initial matter, defendant's objection misconstrues what constitutes "parol evidence." Under Pennsylvania law, parol evidence is defined as

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract ... and unless fraud, accident or mistake be averred, the writing constitutes the agreement

> between the parties, and its terms and agreements cannot be
> added to nor subtracted from by parol evidence.

*DeArmitt v. N.Y. Life Ins. Co.*, 73 A.3d 578, 589 (Pa. 2013) (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. R. Russel & Co.*, 126 A. 791, 792 (Pa. 1924)).[1] Here, plaintiff is *not* attempting to usher in evidence of the parties' "preliminary negotiations, conversations and verbal agreements"; rather, plaintiff is relying on evidence of the parties' course of conduct evidence or of the scope of the contract *after* its execution.

Third, defendant is, of course, correct to point out that the court should not look at evidence extrinsic to the agreement if the agreement is unambiguous. *See Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 613 (3d Cir. 1995) ("Only where the writing is ambiguous may the factfinder examine all the relevant extrinsic evidence to determine the parties' mutual intent.") (examining Pennsylvania law). For the reasons explained below, however, the court finds a latent ambiguity in the parties' agreement. Therefore, McMahon and Verstraete's statements concerning the parties' implementation of the agreement may well be material to the parties' dispute.[2] *See, e.g., Beta Spawn, Inc. v. FFE*

---

[1] As discussed in the court's prior opinion and order on defendant's motion to dismiss, the parties agree that Pennsylvania law governs plaintiff's breach of contract claim. (11/3/17 Op. & Order (dkt. #25) 4.) *See AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 576 (7th Cir. 1995) ("So it comes as no great surprise that rules of contract interpretation, such as the parol evidence and four-corners rules, are deemed substantive, because of their effect on the conduct of contracting parties outside the courtroom, even though the rules operate through limiting the kinds of evidence that are admissible.").

[2] In addition to objecting to statements based on the parol evidence rule, defendant also objects that certain statements as no more than "legal conclusions," which is a valid objection if true, but will have to wait for additional context at trial.

*Transp. Servs., Inc.*, 250 F.3d 218, 227 (3d Cir. 2001) ("Where a contract provision is ambiguous, however, extrinsic evidence may be properly admitted in an attempt to resolve the ambiguity." (quoting *In re Herr's Estate*, 161 A.2d 32, 34 (Pa. 1982)).

*Fourth*, plaintiff asserts a number of hearsay objections to apparent FedEx Ground call logs because they have not been properly authenticated. On the docket, these exhibits are attached to defendant's proposed findings of facts. (Def.'s PFOFs, Exs. C, D, E (dkt. #38-2, 38-3, 38-4).) More importantly for purposes of summary judgment, a FedEx Ground paralegal identifies the exhibits in his declaration. (Kunkler Decl. (dkt. #39) ¶¶ 4-6.) Whatever plaintiff's further evidentiary objection may be at trial, this is certainly sufficient for the court's consideration of these documents as business records under Federal Rule of Evidence 803(6). *See Norman v. AllianceOne Receivables Mgmt., Inc.*, 637 F. App'x 214, 216 (7th Cir. 2015) ("Business records, such as AllianceOne's call logs, are admissible when authenticated by a custodian." (citing Rule 803(6))). Regardless, as described below, plaintiff disputes much of the content of these call logs, calling much of these records into question. Finally, again for reasons discussion below, these records do not materially aid defendant's motion.

UNDISPUTED FACTS

Consistent with the above, the court finds the following facts undisputed and material for the purposes of deciding the present motion when viewed in a light most favorable to plaintiff as the non-moving party, unless otherwise noted.

## A. Overview of the Parties

Plaintiff Brooks Jay Transportation, Inc., is a Wisconsin Corporation with its principal place of business in Wisconsin. Brooks Jay provides ground transportation for the pick-up and delivery of packages in Wisconsin. BJ McMahon is the sole shareholder and President of Brooks Jay.

FedEx Ground Package System, Inc., is a Delaware Corporation, with its principal place of business in Pennsylvania.[3] FedEx Ground is a leading provider of small-package ground delivery services to its customers.

## B. The Operating Agreement

In 1999, Brooks Jay entered into a Pick-Up and Delivery Contractor Operating Agreement with FedEx Ground's predecessor, RPS, Inc. (PFOFs, Ex. B (dkt. #38-2).) At that time, Brook Jay's "station of domicile" was established as Madison, Wisconsin. The Agreement had a one-year term, subject to renewal. (*Id.* at § 11.1 (defining "initial term").) Upon the expiration of this initial term, the Agreement has been renewed annually, for 18 straight years.

The parties point out various portions of their Agreement in support of their respective positions on plaintiff's breach of contract claim. Section 5.1 of the Agreement defines the "Contractor Primary Service Area," and it provides, "Contractor shall be responsible for the daily pick-up and delivery of packages in the Contractor's Primary

---

[3] Defendant has formally moved the court to take judicial notice of public records of its filings with the Delaware Department of State and Form 10-K to establish its place of incorporation and nature of operations, as well as the prior and current location of the FedEx Ground customer, central to the parties' dispute. (Dkt. #40.) That motion will be granted as unopposed.

Service Area, as assigned to Contractor from time to time by RPS, and as shown in Addendum 4 to the Agreement." (*Id.* at § 5.1.) Addendum 4, a 61-page document, describes Brooks Jay's Primary Service Area as at "Station 00537," and then lists the "delivery area," "delivery area exceptions," "pick up area" and "pick up area exceptions" by zip code, "core zone," city, street address and block ranges. (The pick up areas also designate begin and end times.) (*Id.* at pp. 106-68.) The bottom of each page of the Addendum identifies the Station Number as 00537. Madison's Station Number is 00537. This Addendum was executed in August 2015.

In addition, Section 5.3, titled "Recognition of Contractor's Proprietary Interests Served," as amended by Addendum 5 in 2015, provides that

> this Agreement contemplates the recognition both by the parties hereto and by other contractors in the RPS system of a proprietary interest by Contractor in the customer accounts in his/her Primary Service Area as that area is configured from time to time, and a consequent right of Contractor to receive payment in the event his/her Primary Service Area is reconfigured with the result that customers previously serviced by the Contractor are reassigned.

(*Id.* at § 5.3.)

Other sections of the contract concern the use of subcontractors and assignments. Section 3.1 of Addendum 16 was executed August 28, 2015, and concerns subcontracting. That section states, "Contractor may subcontract its obligations to provide Services under the Agreement to any independent contractor under any Operating Agreement with FedEx Ground or to any ISP (Independent Service Provider operating under an ISP Agreement with FedEx Ground ('Subcontractor')." (*Id.* at p.203.) Addendum 16 further provides that the "Contractor agrees that FedEx Ground will pay the Subcontractor for the work

performed in accordance with any agreement FedEx Ground has with the Subcontractor."

(*Id.* at Addendum 16, § 13.2, p.204.)  Section 18 concerns "Assignment" and states, in

pertinent part, "Provided Contractor is in good standing hereunder, Contractor shall, with

30 days' prior written notice to RPS, have the right to assign his/her rights and obligations

hereunder to a replacement contractor acceptable to RPS as being qualified to provide the

services of Contractor under this Agreement . . . ."  (*Id.* at § 18.)

Finally, defendant directs the court to general provisions concerning the expected

conduct of contractors and the method of meeting business objectives.  Section 1.10 of the

Agreement, titled "Agreed Standard of Service," provides in pertinent part:

> RPS has represented to shippers and cosignees that, in
> arranging transportation of packages within the RPS system, it
> will provide a standard of service that is fully competitive with
> that offered by other national participants in the industry.
> Contractor acknowledges the benefits to his/her business of
> participation in the RPS national system, and agrees to
> conduct activities under the terms of the Agreement to achieve
> the results represented to shippers and consignees.

(*Id.* at § 1.10.)  Section 1.15, titled "Discretion of Contractor to Determine Method and

Means of Meeting Business Objectives," provides:

> It is specifically understood and agreed by both parties that
> Contractor shall be responsible for exercising independent
> discretion and judgment to achieve the business objectives and
> results specified above, and no officer, agent or employee of
> RPS shall have the authority to direct Contractor as to the
> manner or means employed to achieve such objectives and
> results.  For example, no officer, agent or employee of RPS shall
> have the authority to prescribe the hours of work, whether or
> when the Contractor is to take breaks, what route the
> Contractor is to follow, or other details of performance.

(*Id.* at § 1.15.)

### C. Spot Services

Standard Pickup and Delivery ("P&D") services differ from so-called "spot" services under the parties' Agreement. Whereas P&D services involve the transportation of packages with vans, spot services involve the transportation of trailers owned by FedEx Ground with semis or tractor trailers supplied by the contractor. The operation of a semi requires a commercial driver's license. Attachment 3.1 to Addendum 3 addresses spot services rendered by Brooks Jay under the Operating Agreement. "Customers regularly request the use of FedEx Ground trailers to facilitate the efficient loading, unloading and transport of larger volume shipments. The position of such trailer is commonly referred to as 'spots' or 'spotted trailers.'" (*Id.* at p.62.) The Attachment further provides that "[a] Conventional Spot generally entails travelling from a FedEx Ground Station, with or without trailer(s), to a Customer location to pick up and/or deliver trailer(s) and then to a FedEx Ground Station or Customer location with or without trailer(s)." (*Id.*)

Brooks Jay uses "trucks," which are identified in Addendum 1 to the Agreement as "vans," to transport the packages, though Brooks Jay points out that it has used subcontractors who use semis to transport packages. Still, it is undisputed that from August 31, 2015, until at least December 31, 2015, Brooks Jay did not possess any vehicles other than vans.[4]

---

[4] Brooks Jay purchased a "straight truck," which McMahon described as a "big moving van, 24-foot long, wider and can hold more packages" than a van, on November 21, 2017. (Def.'s PFOFs (dkt. #38) ¶ 13 & n.1.)

### D. The Ecolab Spot

Ecolab is a FedEx Ground customer. Ecolab requires both P&D and spot services. In October or early November 2015, Ecolab relocated one of its warehouses from South Beloit, Illinois to Beloit, Wisconsin. While the relocation crossed state lines, the distance between the two locations is approximately six miles. During the time Ecolab was located in South Beloit, its spot was serviced out of FedEx Ground's Rockford, Illinois station. Ecolab's new Beloit warehouse, however, was within Brooks Jay's Primary Service Area. (*See* Def.'s PFOFs, Ex. B (dkt. #38-2) p.130 (listing 53511 as a "pick up area").)

Because Brooks Jay did not have the necessary equipment, namely semis and personnel to service Ecolab's spot needs, Brooks Jay arranged for two other, better equipped FedEx Ground contract service providers, Wright Family Enterprises and Ocean Blue, to do so. Those two companies began to provide spot service to Ecolab beginning on November 4, 2015, from FedEx Ground's station in Madison, Wisconsin. Under the terms of the parties' Agreement, FedEx Ground is to pay fees directly to the designated subcontractors, rather than to Brooks Jay. Other than having "initial talks" about the possibility of trading the Ecolab spot for one of the Wright Family Enterprises areas, Brooks Jay did not discuss financial remuneration for allowing Wright Family Enterprises and Ocean Blue to service the Ecolab spot, nor did Brooks Jay discuss with either subcontractor whether they would service Ecolab's spot needs in the long term.

Around mid-November, Brooks Jay and FedEx Ground had several conversations about the plan for servicing Ecolab's spot needs moving forward. During these conversations, the parties discussed the need to service Ecolab out of the Rockford Station.

Eventually, FedEx Ground told Brooks Jay this change would need to be implemented. The parties dispute the content of their subsequent conversations, including: (1) whether Brooks Jay relinquished any proprietary interest in servicing the Ecolab spot; and (2) whether FedEx Ground required service out of Rockford because of economic self-interest or because Ecolab requested that move. There is no dispute, however, that Brooks Jay serviced the Ecolab spot through its subcontractors until November 27, at which time FedEx Ground transferred service to another contractor of its choosing.

Similarly, there appears to be no material dispute that Brooks Jay did not provide FedEx Ground with thirty days' written notice of its intent to assign the Ecolab spot to a another contractor. Specifically, Brooks Jay does not dispute this proposed finding, but points out that the fact assumes it was going to assign the Ecolab account to another contractor, rather than service it itself. For its part, plaintiff points out that it was never asked to complete an assignment form to move Ecolab to another contractor.

### E. FedEx Ground Internal Communications about the Ecolab Account

In planning Ecolab's move to Beloit, Wisconsin, plaintiff points to a FedEx Ground internal email exchange on November 5, 2015, in which FedEx Ground employees discussed the possibility of having Ecolab's former provider continue to service that account out of Rockford. (Kramer Decl., Ex. D (dkt. #52-4).) Gary Grygier, a Fed Ex Ground Sales Executive, conducted an analysis, in which he concluded "[f]rom a transit standpoint [Rockford] is positioned to provide a slightly better competitive transit experience for Ecolab customers." (*Id.* at p.4.)

James Wambach, FedEx Grounds' Madison Station Senior Manager, was also asked whether he was in agreement with the plan to have the Ecolab account serviced out of Rockford. Wambach responded, "My concern would be that BJ McMahon owns the Beloit zip and is aware of this account coming on board. I would think we would need to run by Erik Wrolstad to make sure we handle correctly. I guess BJ could run the trailers to [Rockford]." (*Id.* at p.3.) That same day, Richard Seelhoff, Midway District Managing Director, emailed Thomas Beeman, "let me know if that P&D IC in Madison [referring to Brooks Jay] has a Tractor….as it is that IC's first right to cover…but I know Ecolab has a very strong relationship with [the Rockford] contractor." (Kramer Decl., Ex. O (dkt. #52-15).)

In an email exchange the following day, Wambach indicated that "Contractor BJ McMahon has decided to accept this pickup. He has touched based with Gary Grygier (Sales) about how best to service this account. He plans to sub-contract initially until he makes a final determination on adding a tractor." (Kramer Decl., Ex. H (dkt. #52-7).) In response, Seelhoff responded, "Operating out of [Rockford] correct? We may also need to discuss the deliveries as that was part of this engineered plan…but definitely want to insure compliance to IC Agreement." (Kramer Decl., Ex. G (dkt. #52-7).)

A November 9, 2015, email from Johnny Torok, Pick up & Delivery Manager for FedEx Ground, states that an Ecolab contact told him that "he doesn't care where their packages are serviced from." (Kramer Decl., Ex. J (dkt. #52-10).) Torok confirmed the same in another email to Wambach, dated November 13, 2014. (Kramer Decl., Ex. K (dkt. #52-11) ("I spoke with the sales rep for Ecolab yesterday. He is fine with Ecolab

being serviced out of the Madison market as well. Can we move forward with this? Thank you.").) Despite this exchange, however, Wambach, in an email to Jeremy Sword, Rockford Station's Senior Manager, dated November 19, 2015, indicates that he is "planning to tell BJ that by the end of the next week [servicing of the Ecolab account] needs to go to [Rockford]." (Kramer Decl., Ex. L (dkt. #52-12).)

### F. Course of Conduct Generally

In his declaration, McMahon represents that contractors operating out of more than one terminal station are required to have a separate operating agreement for each station. Defendant objects to this proposed fact based on lack of foundation, and the court agrees that McMahon fails to explain adequately his basis for knowing about other contractors' arrangements with FedEx Ground.

In addition to McMahon's own statement, plaintiff also filed a declaration of Mark Verstraete, the owner of Ocean Blue 2, Inc. Individually or through his company, Verstraete has been a FedEx Ground contractor for 24 years and a linehaul contractor for the last 13 years. Verstraete avers that he operates out of the Madison, Wisconsin station and the Wheeling, Illinois, station, and that he has separate contracts for each station.[5] Verstraete also avers that the spots assigned to him and the payments he receives from FedEx Ground for those spots are tied to a particular station. As such, "a contractor cannot run a pick-up and delivery out of any terminal other than the terminal/station for which

---

[5] Verstraete clarified that he has two contracts for the Madison station, one for P&D and one for linehaul.

the contractor has a contract with FedEx [Ground]." (Pl.'s Add'l PFOFs (dkt. #49) ¶ 135 (citing Verstraete Decl. (dkt. #50) ¶ 8).)

All of this is consistent with plaintiff Brooks Jay's position that it only has one operating agreement with FedEx Ground because "all of its pickups go to Madison and all of its deliveries come from Madison" (Pl.'s Add'l PFOFs (dkt. #49) ¶ 69), and that each van, semi-truck or other FedEx vehicle is associated with one specific terminal station, meaning its payments or settlements are determined, at least in part, by the station serviced.

## OPINION

The parties agree that Pennsylvania law governs plaintiff's breach of contract claim. Under Pennsylvania law, the elements of a breach of contract claim are "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and, (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002)). Here, defendant challenges plaintiff's ability to demonstrate each of those elements.

## I. Contractual Term

There is no dispute that the parties entered into a *valid* contract. Instead, the parties dispute whether one of the terms of their Agreement requires servicing of the FedEx Ground customers located in plaintiff's area through the Madison station. Despite the parties' efforts to prove otherwise, there is no express language one way or the other. In

support of its argument that a customer within one of Brooks Jay's primary service areas may be transferred to another station, FedEx Ground directs the court to the Agreement's general provisions addressing: FedEx Ground's commitment to "provide a standard of service that is fully competitive"; Brooks Jay's agreement to "conduct activities under the terms of this Agreement to achieve the results represented to shippers and consignees"; and FedEx Ground's responsibility for setting "business objectives and results." (Def.'s Opening Br. (dkt. #37) 6-7 (quoting Def.'s PFOFs, Ex. B (dkt. #38-2) § 1.15, 5.1).) As quoted above, *none* of these provisions address the parties' core dispute: whether Brooks Jay's services under the Agreement are tied to the Madison station.

Defendant also points to the fact that the Addendum describing spot services does not limit those services to "Brooks Jay's station of domicile." (*Id.* at 7.) Yet as plaintiff points out, defendant could have included this limitation as the drafter of the Agreement and arguably chose not to do so. *See Ruiski v. Pribonic*, 515 A.2d 507, 510 (Pa. 1986) ("[D]oubtful language is construed most strongly against the drafter thereof.").

For its part, plaintiff directs the court to the prominent place of the Madison station number, 00537, which appears at the bottom of every page of the contract, and Addendum 4, which describes Brooks Jay's primary service areas -- also identifying the station number as 00537. Plaintiff similarly relies on Section 5 of the Agreement as providing that payments are at least partially tied to whether the "Contractor's terminal meeting it[s] service goals." (Pl.'s Opp'n (dkt. #47) 11 (citing Def.'s PFOFs, Ex. B (dkt. #38-2) 30).) While the court finds this evidence persuasive (or at least more persuasive than that presented by defendant), there is no express language limiting Brooks Jay's contractual

agreement with FedEx Ground to the Madison station, or otherwise requiring the servicing of accounts within Brooks Jay's primary service area out of the Madison station. Even conceding the language plaintiff points to is more "specific" than the more general provisions on which defendant relies, the terms on which plaintiff relies are *not* sufficiently specific or clear to find that Brooks Jay's servicing is limited by the Agreement's own terms to the Madison station. *See Marcinak v. Se. Greene Sch. Dist.*, 544 A.2d 1025, 1027 (Pa. Super. Ct. 1988) ("[S]pecific provisions of a written contract ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject.").

Given the nature of their dispute, the parties' arguments are largely ships passing in the night, both purporting to label the contract as unambiguous and to simply be relying on the contract's language. While plaintiff fails to argue that the contract contains an ambiguity, it nonetheless directs the court to extrinsic evidence, as described above in the fact section. Under Pennsylvania law, as defendant repeatedly points out, "[c]lear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 93 (3d Cir. 2001) (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993)). Defendant's argument seems focused on an ambiguity on the face of the contract, a so-called *patent* ambiguity. *Id.*

In contrast to a patent ambiguity, "a latent ambiguity arises from extraneous or collateral facts, which make the meaning of a written agreement uncertain although the language thereof, on its face, appears clear and unambiguous." *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 614 (3d Cir. 1995) (quoting *Easton v. Wash. Cty. Ins.*

*Co.*, 137 A.2d 332 (Pa. 1957)). Interpreting Pennsylvania law, the Third Circuit instructs that a party may rely on extrinsic evidence "but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract." *Bohler-Udderholm*, 247 F.3d at 93. "[T]he parties' expectations, standing alone, are irrelevant without any *contractual hook* on which to pin them." *Id.* (quoting *Duquesne Light*, 66 F.3d at 614 & n.9) (emphasis in *Bohler-Udderholm*).

Critical to this case, "[a] latent ambiguity may also arise 'through silence or indefiniteness of expression.'" *Stinebeck v. Cutrona*, No. CIV.A. 06-CV-01883, 2008 WL 859240, at *13 (E.D. Pa. Mar. 28, 2008) (quoting *Crown, Cork & Seal Co. v. Employers Ins. of Wausau*, No. CIV.A. 99-4904, 2002 WL 31174702, at *2 n.1 (E.D. Pa. Sept. 27, 2002)). Indeed, in the *Bohler-Udderholm* case, in which the Third Circuit refined the test for determining a latent ambiguity, the court affirmed the district court's finding of a latent ambiguity with respect to a facially unambiguous rebate clause, because it was *silent* in the particular context central to the parties' dispute. *See Montgomery, McCracken, Walker & Rhoads, LLP v. H&K Grp., Inc.*, No. CV 16-4080, 2017 WL 1333243, at *4 (E.D. Pa. Mar. 24, 2017) (discussing *Bohler-Udderholm*)

While plaintiff fails to develop this framework for considering extrinsic evidence, it extensively develops extrinsic evidence to support plaintiff's reliance on the Madison station number in the Agreement -- the necessary "contractual hook" -- to support a finding of a latent ambiguity. Specifically, plaintiff points to the fact that all of Brooks Jay's

services are tied to the Madison station (at least since the 2015 addendum),[6] FedEx Ground's practice of having a contractor enter into separate agreements with each station for which it seeks to provide services, and FedEx Ground's internal emails concerning the Ecolab spot, which appear to support plaintiff's interpretation that under the Agreement, the spot was tied to the Madison station. This course of conduct evidence is compelling evidence of the parties' intent to contract for Brooks Jay's services for particular service areas tied to the Madison station. *See Resolution Tr. Corp. v. Urban Redevelopment Auth. of Pittsburgh*, 638 A.2d 972, 976 (Pa. 1994) ("[I]n the absence of an express provision to the contrary, custom or usage, once established, *is considered a part of a contract* and *binding on the parties though not mentioned therein*, the presumption being that they know of and contracted with reference to it." (emphasis added)). From this evidence, the court concludes that there is a latent ambiguity in the contract with respect to whether Brooks Jays' servicing of the FedEx Ground customers within its primary service areas is tied to the Madison station.

"If the contract terms are ambiguous or incomplete, and extrinsic evidence is examined, interpretation of the contract becomes a question of fact, unless the extrinsic evidence is conclusive." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 233 (3d Cir. 2001). Here, while the court finds plaintiff's evidence compelling, it stops short of being conclusive. Moreover, plaintiff did not move for summary judgment as to this issue. As

---

[6] The court notes plaintiff's recent filing indicating that FedEx Ground produced some documents from 2008 and 2009 indicating that Brooks Jay provided services out of the Rockford station. (Pl.'s Letter (dkt. #67).) The import of this purported evidence will await another day.

such, the court concludes that the jury will be required to determine which of the two interpretations of the contract is controlling. *See Bohler-Udderholm*, 247 F.3d at 94 ("Once the court determined that a party has offered extrinsic evidence capable of establishing latent ambiguity, a decision as to which of the competing interpretations of the contract is the correct one is reserved for the factfinder, who would examine the content of the extrinsic evidence (along with all other evidence ) in order to make this determination."); *see also Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009) ("In circumstances where the language chosen by the parties is ambiguous, deciding the intent of the parties becomes a question of fact for a jury." (quoting *Cmty. Coll. of Beaver Cty. v. Cmty. Coll. of Beaver*, 375 A.2d 1267, 1275 (Pa. 1977))).

For purposes of the present motion, the court denies defendant's request for summary judgment on the basis that there is no contract term giving rise to plaintiff's claim for a breach of contract. The jury will be required to determine whether the parties' Agreement ties Brooks Jay's services of the FedEx Ground's customers in its primary services areas to the Madison station. [7]

---

[7] If the jury finds that FedEx Ground does have the contractual right to designate WHERE the Ecolab Spot will be located (*i.e.*, Rockford rather than Madison), then the dispute would seem to center on whether Brooks Jay was offered a fair opportunity to service that spot and declined to do so (or was incapable of doing so). While Brooks Jay's claim that it did not decline to service Ecolab at the Rockford Station rests on the razor thin denials of McMahon, *see* Response to PFOF 51 (denying recollection of being offered "spot out of Rockford" and denying ever declining "to service Ecolab out of Rockford"), these factual issues will turn on credibility determinations for the jury.

## II. Breach of the Contract

Defendant also seeks summary judgment on the second element of plaintiff's claim -- that defendant breached the contract, though its theory is not entirely clear. Defendant appears to posit two bases for a reasonable jury to reject plaintiff' claim of breach. First, defendant points to plaintiff's use of subcontractors, coupled with its failure to obtain a semi truck and a driver with a CDL license, both of which are necessary to serve the Ecolab spot directly, as evidence that plaintiff could not have serviced the spot. This evidence, however, must be viewed in light of both the short period of time Brooks Jay serviced the Ecolab spot before it was returned to the previous contractor, and Brooks Jays' efforts during that time to either secure a more permanent subcontracting arrangement with Ocean Blue or Wright Family Enterprises, assign the spot to one of those entities for compensation, or acquire a semi truck and hire a driver with a CDL. Moreover, defendant does not plead an impossibility affirmative defense and even if it had, the evidence, viewed in the light most favorable to plaintiff, supports a jury finding that plaintiff was performing -- e.g., had arranged for satisfactory servicing of the Ecolab spot out of the Madison station by subcontractors -- and was actively pursuing longer term options for continuing that service.[8]

---

[8] The parties dance around this issue of the limited period of time Brooks Jay was provided to arrange for services of the Ecolab spot out of Rockford. The court does not view this as an independent breach of contract theory, but rather this evidence is relevant to the parties' dispute as to whether Brooks Jay was in a position to service directly or arrange for service of the Ecolab spot.

*Second*, defendant contends that plaintiff's principal, McMahon, relinquished his right to service the Ecolab spot in phone calls. Since plaintiff directly disputes this characterization, this, too, is an issue for the jury.

Accordingly, the court will deny defendant's motion for summary judgment as to a finding of a lack of breach.

## III. Damages

Finally, defendant seeks summary judgment on the ground that Brooks Jay cannot seek compensatory damages, and thus cannot satisfy the third element of a breach of contract claim under Pennsylvania law, because Ocean Blue and Wright Family Enterprises, the subcontractors, were the ones who received settlements or payments from FedEx Ground, and therefore were the parties who suffered compensatory damages. This argument warrants little discussion.

While the settlements during the short period of time that the Ecolab spot was serviced out of the Madison station were paid to the subcontractors, McMahon testified at his deposition that Brooks Jay contemplated: (1) some payment from the subcontractors to Brooks Jay once there was sufficient data as to the volume of the pickup needs to estimate a reasonable payment; or (2) Jay would eventually be compensated through assignment of that spot. Alternatively, Brooks Jay may have serviced the spot directly, resulting in future missed settlements from FedEx Ground's transition of the Ecolab spot to the Rockford station. All of this forms a sufficient basis from which a reasonable jury could find that plaintiff suffered damages.

Related to this last argument, defendant also contends that Brooks Jays' damages are speculative because it did not have the necessary equipment and personnel to service the Ecolab spot. Here, too, plaintiff put forth evidence that it was exploring purchasing a semi truck and hiring a driver with a CDL license. This evidence is sufficient at least to raise a genuine issue of material fact as to whether its claim of damages is speculative.

For these reasons, the court also rejects defendant's argument for summary judgment based on lack of a damages theory.[9]

## ORDER

IT IS ORDERED that:

1) Defendant FedEx Ground Package System, Inc.'s motion for summary judgment (dkt. #36) is DENIED.

2) Defendant's motion for judicial notice (dkt. #40) is GRANTED.

Entered this 30th day of March, 2018.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge

---

[9] Given that Brooks Jay is already in the business and would not be starting from scratch, the court is unable to say that a lost-profits-type damage claim is purely speculative, but obviously will consider the evidence by both sides at trial carefully, particularly given that this appears to be a new branch of plaintiff's business and FedEx Ground at least represents that it's customer wanted to switch back to its original contractor.